Submitted November 27, 2012, affirmed September 11, petition for review denied December 26, 2013 (354 Or 656)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DELFINO HURTADO-NAVARRETE,
*Defendant-Appellant.*

Washington County Circuit Court
C090781CR; A144965

309 P3d 1128

Peter Gartlan, Chief Defender, and Ryan T. O'Connor, Senior Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Janet A. Klapstein, Senior Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Haselton, Chief Judge, and Sercombe, Judge.

SERCOMBE, J.

## SERCOMBE, J.

Defendant appeals a judgment of conviction for murder, ORS 163.115, abuse of a corpse in the second degree, ORS 166.085, and unlawful use of a weapon, ORS 166.220, all relating to the murder of his girlfriend. He raises four assignments of error, three of which we reject without discussion. We write only to address defendant's contention that the trial court erred in denying his motion to suppress statements that he made to police regarding the murder. Specifically, he argues that police violated his state and federal constitutional rights against compelled self-incrimination by failing to advise him of his *Miranda* rights before questioning him. The state responds that the circumstances in which defendant made the statements were not custodial or compelling in nature and that, in any event, police had advised defendant of his *Miranda* rights three times prior to the interrogation—including twice the day before—and nothing had occurred in the interim that could have caused a reasonable person to believe that his rights had changed. We conclude that the prior *Miranda* warnings remained valid and, accordingly, affirm.

In reviewing a denial of a motion to suppress, we are bound by the trial court's findings of historical fact when there is constitutionally sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). We state the facts consistently with that standard. On March 10, 2009, defendant reported to the Hillsboro Police Department that his girlfriend and her vehicle were missing, and police began an investigation. From that time until April 3, 2009, when defendant made the statements at issue, defendant had at least 15 contacts with police, the majority of which he initiated in an effort to monitor the investigation and provide police with additional information. Defendant most often interacted with Hillsboro Detective Brady.

Defendant agreed to take a polygraph test on March 23. Before the test, defendant was formally advised of his *Miranda* rights, and he signed a form indicating that he understood them. However, the test was cancelled

and ultimately rescheduled for April 2. On that day, at approximately 2:30 p.m., defendant was again formally advised of his *Miranda* rights, and he signed another form indicating that he understood them. Defendant then took the polygraph test. After the test, defendant agreed to speak with Brady and another detective, Ganete, in the interview room at the Hillsboro Police Department. There, at about 6:35 p.m., Ganete read defendant his *Miranda* rights, and defendant orally indicated that he understood them.

During the interview, Brady and Ganete suggested that defendant was lying because he had failed the polygraph test and because information from his phone records contradicted his version of events. At approximately 9:00 p.m., defendant asked for a lawyer. Brady and Ganete then terminated the interview and told defendant that he was free to leave. Two hours later, Brady and Ganete drove defendant to his residence. Upon arriving, defendant invited the detectives inside and asked them for police protection. Brady reminded defendant that he had asked for a lawyer and explained that they had to allow him the opportunity to seek legal counsel before speaking with him. Brady also told defendant that he was "a free man" and "not in custody." Defendant indicated that he understood and reiterated that he did not wish to speak to the detectives without a lawyer present. Brady and Ganete then left the residence.

The next morning, April 3, police found a body that was believed to be that of defendant's girlfriend. Shortly thereafter, defendant called Brady's cell phone and asked to speak with Ganete. Ganete asked if he could call defendant back on a land-line telephone, and defendant agreed. Upon answering Ganete's call, defendant asked if Ganete and Brady could come to his residence and talk. Ganete responded:

> "I can go to your house * * * the problem you have to understand that you are a free man and if you want an attorney you have the right to find an attorney on your own * * * you are completely free to do that. And if you want to talk to us of your own free will * * * there is no problem."

Defendant replied, "[C]ome here to my house." Shortly thereafter, defendant reiterated, "I don't want to wait for the

attorney, because if I wait longer I know you guys will probably not find me \* \* \*, you won't find me here well."

Brady and Ganete traveled to defendant's residence, and defendant invited them inside. A woman was also present; the detectives asked her to leave, and Ganete searched the interior of the residence to confirm that no one else was there. Before beginning the interview, Brady asked defendant multiple times whether he wanted to speak with the detectives. Brady also informed defendant that he was "free," "not in custody, or under arrest," and that he could ask them to leave at any point. Defendant said that he understood and that he wanted to speak with them.

Brady then asked defendant what he wanted to say. Defendant explained that people involved with guns and drugs had kidnapped his girlfriend. When defendant then began to make crying sounds, Brady said, "I don't believe you, and your cries look fake, and there's no tears, and I believe you're lying to me." Shortly thereafter, Brady suggested that defendant had found out that another person was "fucking his wife" and that defendant was "pissed \* \* \* off" and hurt her. Brady then pointed his finger at defendant, chuckled, and, in a "friend[ly]" tone, said, "You're an evil motherfucker. \* \* \* You're an evil son of a bitch, with all your fake crying, and your fake lying. \* \* \* You're the devil. I think you hurt her." (Internal quotation marks omitted.) Defendant, who did not appear angry or afraid, replied, "No."

Brady then suggested that they "start over" and "forget all the lies," and he reintroduced himself to defendant. At that point, defendant told the detectives that he would take them to his girlfriend and asked if he could first take a shower. Brady said, "Can you not take a shower? Just \* \* \* tell us where she's at." Defendant explained that he had "beat her up." Defendant then commented that "he probably would not be free to go." Brady replied, "no," because, as he explained at the hearing, "[he] didn't know about that, because [he] didn't know what happened yet." Defendant then confessed to the murder, and he was placed under arrest at approximately 11:00 a.m.

Defendant was ultimately charged with murder, second-degree abuse of a corpse, and unlawful use of a

weapon. Before trial, defendant moved to suppress the statements that he had made to the detectives at his residence on April 3. He argued that he had made those statements while in custody or under compelling circumstances and that he was therefore entitled to *Miranda* warnings before being questioned by the detectives. The state responded that the circumstances were not custodial or compelling in nature and that, even if they were, defendant, having been formally advised of his *Miranda* rights at least three times prior to April 3, understood his rights.

The trial court denied defendant's motion to suppress. It concluded that "[a]t no time during defendant's multiple contacts with police between March 10, 2009 and April 3, 2009, was defendant in police custody, nor were the circumstances compelling such as would require a *Miranda*-type warning, until the time he was placed under arrest on April 3, 2009." In any event, the court found, "defendant was advised of [his *Miranda*] rights on three separate occasions during his contacts with the police": (1) before the cancelled polygraph test on March 23; (2) before the polygraph test on April 2; and (3) before the interrogation at the Hillsboro Police Department on April 2. In the court's view, defendant "knew and understood [those] rights[,]" and "police made contact with defendant on April 3, 2009, at his residence at his request. During [that] contact defendant knew [that] he did not have to speak with the police and that the police would leave his house if he asked them to do so." A jury found defendant guilty as charged.

On appeal, defendant largely reiterates his arguments before the trial court. Specifically, he argues that he was either in custody or under compelling circumstances when the detectives questioned him on April 3 and that, accordingly, the detectives violated his rights under Article I, section 12, of the Oregon Constitution, and under the Fifth Amendment to the United States Constitution, when they failed to advise him of his *Miranda* rights. Defendant acknowledges that he "had been provided with full *Miranda* warnings at least three times in the month since [his girl-friend] disappeared[,]" but, in his view, those warnings were "stale" and the detectives "were required to fully advise

defendant with *Miranda* warnings when circumstances became compelling on April 3 at his apartment." The state responds that the circumstances were not custodial or compelling and that, in any event, nothing had occurred since the prior warnings that could have caused a reasonable person to believe that his rights had changed.

Article I, section 12, provides that "[n]o person shall be * * * compelled in any criminal prosecution to testify against himself." Under that section, police are required to "give *Miranda* warnings to a person who is in 'full custody' or in circumstances that 'create a setting which judges would and officers should recognize to be compelling.'" *State v. Jarnagin*, 351 Or 703, 713, 277 P3d 535 (2012) (quoting *State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990)) (some quotation marks omitted). Similarly, the Fifth Amendment provides that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself[.]" That amendment requires that police give *Miranda* warnings when a person is "'in custody,' *i.e.*, when a person's freedom has been 'significantly restrained,' even if the person is in his or her own home or other familiar surroundings." *Smith*, 310 Or at 8 (quoting *Oregon v. Elstad*, 470 US 298, 309, 105 S Ct 1285, 84 L Ed 2d 222 (1985)).

Here, we need not consider whether the circumstances on April 3 were custodial or compelling in nature. That is so because the trial court found, and it is undisputed, that police advised defendant of his *Miranda* rights at least three times—including twice on April 2—and we conclude that new warnings were not required under either the state or federal constitution.

"To determine whether[,] under state law, a defendant must be re-advised of his *Miranda* rights, we look at whether, under the totality of the circumstances, a reasonable person could believe that his or her rights have changed since the time they were originally given." *State v. Field*, 231 Or App 115, 121, 218 P3d 551 (2009) (citing cases). "Likewise, under federal law, we must consider the totality of the circumstances to determine whether successive interrogations require a suspect to be re-advised of his *Miranda* rights; there is no *per se* rule that a suspect

must be re-advised based merely on the passage of time or a change in questioners." *Id.* (citing *U.S. v. Andaverde*, 64 F3d 1305, 1312 (9th Cir 1995)). Accordingly, "we must determine whether the original warnings were sufficient, under all the circumstances, to fairly advise defendant of his rights in the context of the later questioning." *Id.* at 121-22.

Defendant argues, in part, that the present case is comparable to *State v. Metz*, 131 Or App 706, 887 P2d 795 (1994), *rev den*, 323 Or 483 (1996). In that case, police twice advised the defendant of his *Miranda* rights in the context of an interrogation. *Id.* at 711. The next day, the defendant made incriminating statements to the state's psychologist during a psychological exam. *Id.* at 710. The defendant moved to exclude those statements, the trial court denied the motion, and the defendant appealed. On appeal, the state argued that the original warnings remained valid for purposes of the psychological exam. *Id.* at 711. We disagreed:

> "[D]efendant was warned of his right to counsel 29 hours earlier and in the context of interrogation by police officers, not a psychological exam. The circumstances had materially changed between the officers' advice of rights and the psychological examination the next day."

*Id.* at 712; *see also State v. Stevens*, 311 Or 119, 138, 806 P2d 92 (1991) (concluding that police were not required to readminister *Miranda* warnings following "[t]he mere transfer [of the defendant] to another car and another officer" and contrasting that situation with one where a defendant is later examined by a psychiatrist—noting the risk that a defendant "may misunderstand the nature of the relationship between himself and the psychiatrist").

The state argues that *Metz* is inapposite and instead points to *Field*. In that case, the defendant was advised of his *Miranda* rights prior to a voluntary interview with police. Later that night, the defendant was arrested, but police did not readminister *Miranda* warnings. 231 Or App at 118. Two days later, a detective spoke with the defendant in jail, and the defendant made incriminating statements. *Id.* at 118-19. The trial court denied, in part, the defendant's motion to suppress statements made to the detective, and the defendant appealed, arguing that "the court should have

suppressed statements made by [him] after his arrest because he was not given *Miranda* warnings at that time." *Id.* at 120. We disagreed, concluding that the failure of police to readvise the defendant of his *Miranda* rights did not violate the state or federal constitutions:

"Under the described circumstances, we conclude that nothing occurred that would lead a reasonable person to believe that his *Miranda* rights had changed. The warning defendant was given at the police station in the afternoon of July 3 was not limited in scope. Furthermore, defendant was never outside the presence of the police from the time that he was first advised of his *Miranda* rights until the time of his arrest. Additionally, when he met with [the detective] two days later, defendant indicated that he was aware of and understood his rights. Before she questioned him, [the detective] reminded him that he did not have to speak with her and had a right to an attorney. Defendant responded by acknowledging his rights, stating that he had 'the right to say no or end the conversation.' All the foregoing circumstances, taken together, persuade us that a reasonable person in defendant's position, having previously been advised of his *Miranda* rights, would have had no reason to believe that those rights had changed. For the above reasons, the officers were not required to formally re-advise defendant of his rights at the time of his arrest."

*Id.* at 122 (brackets omitted).

The present case is more analogous to *Field* than to *Metz*. Here, defendant was formally advised of his *Miranda* rights three times, and, importantly, two of the warnings were provided less than a day in advance of the April 3 interrogation. Each time he was warned, he indicated that he understood his rights, and none of those warnings were limited in scope. Moreover, before detectives questioned defendant on April 3, they reminded him that he had the right to an attorney and that he did not have to speak with them. Defendant responded that he understood and that he wanted to speak. Finally, in contrast with *Metz*, the last warning was given in circumstances that were materially indistinguishable from those in which the later statements were made; that is, both involved interrogations conducted by the same two detectives regarding the same subject matter.

Accordingly, nothing occurred that would lead a reasonable person to believe that his *Miranda* rights had changed. *See also U.S. v. Rodriguez-Preciado*, 399 F3d 1118, 1128-30 (9th Cir 2005) (police not required to readvise suspect of *Miranda* rights on second day of questioning); *People of Territory of Guam v. Dela Pena*, 72 F3d 767, 770 (9th Cir 1995) (police not required to readminister *Miranda* warnings before custodial interrogation where no intervening event suggested that the suspect's rights had changed during a 15-hour break); *Andaverde*, 64 F3d at 1313 (one-day interval between *Miranda* warnings and later interrogation held constitutional).

Defendant argues that his "invocation of his right to counsel and re-initiation of contact with Brady and Ganete constituted factually and constitutionally significant events that altered the circumstances enough that the prior warnings no longer served to protect defendant's *** privilege against self-incrimination." We disagree. Put simply, the fact that defendant *exercised* his right to counsel and then later reinitiated contact with police and waived that right demonstrates the opposite—that is, it demonstrates that, as the trial court found, defendant "knew and understood [his] rights."

In sum, we conclude that, under the totality of the circumstances, a reasonable person in defendant's position, having been advised multiple times of his *Miranda* rights, would have had no reason to believe that those rights had changed. The detectives were therefore not required to readvise defendant of his *Miranda* rights before questioning him on the morning of April 3. The trial court did not err in denying defendant's motion to suppress.

Affirmed.