SHORR, J.
*638 Defendant appeals from a judgment of conviction for aggravated murder, ORS 163.095(2)(d), and felony murder, ORS 163.115(1)(b). Defendant was convicted for the murder of Jacqueline Bell, the great-grandmother of Joda Cain, defendant's cousin and the codefendant in this case.[1] We write to address three of defendant's five assignments of error.[2] In his first assignment of error, defendant challenges the trial court's determination that defendant was fit to proceed to trial. In his second assignment of error, defendant argues that the court erroneously denied his motion to suppress evidence that defendant contends was obtained in violation of his Miranda rights. Finally, in his fifth assignment of error, defendant challenges the constitutionality of his sentence under the Eighth Amendment to the United States Constitution.[3] For the reasons discussed below, we reject each of those assignments of error. Accordingly, we affirm.
I. FACTUAL AND PROCEDURAL HISTORY
We begin with a brief summary of the facts underlying defendant's conviction and the procedural events that gave rise to the issues on appeal. In our analysis of defendant's trial competency and Miranda arguments, we provide additional facts and procedural details that are relevant to those particular issues.
Defendant was arrested and charged along with his cousin, Cain, in October 2013 for the killing of Cain's great-grandmother, Bell. Police officers discovered Bell's body in her bedroom on the morning of October 5 during a welfare check at her home. She had been bludgeoned to death with a hammer. Soon thereafter, an Oregon state trooper observed Bell's car-which was being driven by Cain and in which defendant was a passenger-weaving on the road. The officer attempted to initiate a stop. A 15-mile *639 high-speed chase ensued. The police were eventually able to force the vehicle to a halt. Cain was arrested immediately. Defendant fled on foot but was quickly caught and arrested as well. The police found Bell's purse, wallet, and jewelry in the car. The police also found a pair of gloves belonging to Cain and a shirt and pair of shorts belonging to defendant, all of which had Bell's blood on them.
Defendant was held at the Union County Jail from October 5 until October 9, when he was transported to Washington County for his arraignment. He was charged and indicted by a grand jury for two counts of aggravated murder and two counts of felony murder. Before trial, defendant filed two motions relevant to his appeal. In the first, defendant argued that he was not fit to proceed to trial. Defendant has a lifelong intellectual disability. The trial court, concerned for defendant's fitness, initially ordered a psychological evaluation and, based on the results, determined that defendant was both unfit to proceed to *302 trial and unsuitable for community release. The court then committed defendant to the custody of the Oregon State Hospital. As discussed in greater detail below, defendant remained there for approximately six months, at which point the state hospital recommended that the court find defendant fit to stand trial in light of the rehabilitation that had occurred during his confinement there. Defendant presented independent expert testimony challenging the possibility that he was, or could ever be, fit to proceed. Following a hearing, the court determined that defendant was competent to stand trial.
Defendant then moved to suppress statements that he had made to police officers on October 5 and on October 9, on the basis that that evidence was obtained in violation of his Miranda rights. With respect to the earlier statements, defendant argued that the officers continued to question him after he had invoked his right to remain silent. Defendant further argued that that violation tainted the interrogation on October 9, such that the trial court was also obligated to suppress any statements made on that later date. As discussed in greater detail below, the court suppressed the October 5 statements after concluding that the officers had ignored defendant's unequivocal invocation of his right to *640 remain silent. That ruling is not at issue in this appeal. But the court denied defendant's motion to suppress the statements made at the October 9 interrogation after concluding that defendant had voluntarily waived his Miranda rights notwithstanding the earlier violation.
Defendant was subsequently tried and found guilty by a jury on both charges. The jury, having been instructed to consider mitigating factors, handed down a sentence of life without the possibility of parole.[4] Arguing that the Eighth Amendment categorically prohibits imposing a true life sentence on a person with an intellectual disability, defendant moved the sentencing court for the more lenient sentence of life with the possibility of parole after defendant has served the minimum term of 30 years, ORS 163.105(1)(c). The sentencing court merged the guilty verdicts into a single conviction for aggravated murder and denied the motion to impose less than the jury's sentence. As a result, defendant was sentenced to life without the possibility of parole. That sentence was duly imposed, and defendant appealed.
II. ANALYSIS
On appeal, defendant raises the assignments of error described above. We address each in turn, providing additional facts as necessary to explain our decision on each of those three assignments.
A. Defendant's First Assignment of Error
In his first assignment of error, defendant contends that the trial court erroneously determined that he was fit to proceed to trial. After defendant was arrested and charged, defense counsel became concerned that defendant was intellectually disabled and not competent for trial. Defendant moved to have the trial court determine whether he was competent. He made an initial showing in support of that motion in the form of three psychological evaluations that demonstrated that defendant was likely intellectually *641 disabled. The court granted defendant's motion to hold a competency hearing. Defendant was transported to the Oregon State Hospital so that the state could evaluate him and render an opinion on his trial fitness. Defendant remained in the state hospital for approximately six months. During that time, he was formally evaluated three times by Dr. Stover, a psychologist employed by the state hospital. Based on his first two evaluations, Stover concluded that defendant was not yet fit to proceed but could be restored to fitness. Based on his third evaluation, and in light of defendant's day-to-day conduct and behavior at the state hospital, Stover concluded that defendant had been rehabilitated and now met the minimum standards for competency. *303 Defendant challenged Stover's conclusions. Defendant maintained that he was not fit to proceed to trial and could not be restored to competence. He supported that contention with a report from Dr. Froming, a psychologist retained by defendant to independently evaluate defendant's competence. The court held a hearing pursuant to ORS 161.370, with experts from both sides presenting competing perspectives on defendant's trial fitness.[5] The experts agreed that, clinically, defendant had a "mild intellectual disability." But they disagreed, based on their subjective evaluations of the testing data and their in-person interviews of defendant, whether defendant's condition rendered him unfit for trial.
Following the hearing, the trial court concluded that defendant was fit to proceed to trial. The court found, based on the testimony and evidence presented at the competency hearing, that
"defendant has the ability to communicate with his counsel in a meaningful way. He understands the nature of *642 the proceedings against him and the role he plays as a defendant in this case. He has the ability to make decisions intelligently that affect his case. And he has adequate memory about the incident and things that will happen in the course of the trial to participate in his defense."
Defendant challenges that decision on appeal. His primary contention is that the trial court committed legal error because there was insufficient evidence to support the court's finding of fitness to proceed to trial. Defendant argues that the evidence of his intellectual disability proved that he was not, and could never be, fit to stand trial as a matter of law.
The state does not dispute that defendant is intellectually disabled but argues that that alone does not resolve whether defendant was competent to stand trial. The state contends that there is sufficient evidence in the record to support the trial court's conclusion that defendant met the minimum standard for competency to stand trial.
The minimum competency standard-the one required by federal due process for every criminal defendant-was announced in Dusky v. United States , 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Under the so-called Dusky standard, a criminal defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." Id . at 402, 80 S.Ct. 788 ; see also Drope v. Missouri , 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) (trial fitness involves the "capacity to understand the nature and object of the proceedings[,] * * * to consult with counsel, and to assist in preparing [a] defense" (citing Dusky , 362 U.S. 402, 80 S.Ct. 788 ) ). The Dusky standard is a "modest" one that "seeks to ensure that [a defendant] has the capacity to understand the proceedings and to assist counsel." Godinez v. Moran , 509 U.S. 389, 402, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993).
Oregon's statutory standard has similar requirements to the Dusky standard. Under ORS 161.360(2),
"[a] defendant may be found incapacitated if, as a result of a qualifying mental disorder, the defendant is unable:
*643 "(a) To understand the nature of the proceedings against the defendant; or
"(b) To assist and cooperate with the counsel of the defendant; or
"(c) To participate in the defense of the defendant."
Both defendant and the state contend that ORS 161.360(2) codifies the minimum due process standard stated in Dusky . We accept that argument for the purpose of this appeal.
*304 See also State v. Simon , 294 Or. App. 840, 865, 433 P.3d 385 (2018) ("The statutory standard under ORS 161.360(2) implies the same standard [as Dusky ]."). We proceed to determine whether there was sufficient evidence to support the trial court's conclusion that defendant was fit to proceed to trial in light of the above-stated factors.
The trial court in this case was confronted with determining defendant's competency based in substantial part on the competing opinions of two qualified experts. On appeal, as at the competency hearing, defendant relies primarily on Froming's testimony but also cites to the testimony of others who observed defendant at various points in his life and could comment on his level of intellectual functioning. In response, the state highlights Stover's testimony and argues that he provided sufficient evidence to support the court's competency determination.
In his final report recommending that the trial court find defendant competent to stand trial, Stover summarized his conclusions as follows:
"[Defendant] is not impacted by [his] mild intellectual disability to the extent that substantially interferes with his abilities to assist and cooperate with his attorneys, decide how to plead, appreciate the criminal confession embedded in a guilty plea, rationally foresee the consequences of pleading guilty versus not guilty, decide whether to testify, share his impressions with his attorneys about the content of court hearings, or elicit their explanation about aspects of hearings that he does not understand, if he chooses to do so.
"It is my professional opinion that [defendant] understands the nature of the proceedings against him, is capable *644 of assisting and cooperating with defense counsel, and is capable of participating in his defense. He is able to make decisions relevant to his case in a rational and autonomous manner. I respectfully recommend the Court find him trial competent."
Stover's testimony at the competency hearing explained the bases for his conclusion. Stover testified that he had evaluated defendant three times over the approximately six months that defendant had spent at the state hospital. Each time, Stover noted meaningful improvements in defendant's ability to communicate and display rational and autonomous decision-making. For example, defendant provided increasingly sophisticated and rational responses when Stover posed him with a question based on hypothetical legal scenarios unrelated to defendant's case. Stover also spoke with defendant in the presence of defendant's attorneys and was able to observe his interactions with them. Based on those observations, Stover concluded that defendant could communicate "rationally and intelligently enough to assist his attorneys." After his third and final evaluation, Stover was convinced that defendant had a sufficient understanding of the case against him and the role that he and other relevant persons played in the proceedings as well as the capacity to communicate and make rational, autonomous decisions related to his case.
Stover did acknowledge that defendant "has a very real disability that has impacted him from very early on up to this point and will continue to impact him for the rest of his life." As a result, defendant would need accommodations at trial, including the opportunity to confer more frequently with his counsel than perhaps a defendant of more average intellectual ability to ensure that he understood what was happening and was able to offer his input. But, with the proper guidance, Stover was confident that defendant possessed the ability to adequately process information, communicate with his attorneys, and assist in his defense. Ultimately, Stover reiterated his conclusion that defendant was fit to stand trial.
Froming reached the opposite conclusion. Her report concluded that,
*645 "[w]hile [defendant] may be able to rehearse and memorize the actors in the legal context, his ability to assist in a rapidly progressing, highly verbal context of the courtroom is not possible. His language disorder, comprehension level, concreteness and impaired abstract reasoning make it impossible to track, respond, and hold the complex elements in mind to make clear and reasoned decisions or to relay clear and reasoned responses to his attorney's inquiries. It is this examiner's *305 opinion that [defendant] is not competent nor will he be restorable due to the nature of his intellectual and neuropsychological deficits and the requirements of the courtroom."
Froming testified at the competency hearing to explain her conclusion. Froming testified about the various tests that she had administered to defendant to gauge the nature and extent of his intellectual disability. She indicated that defendant scored poorly-often in the moderately-to-severely impaired or low-average range-on tests designed to assess, among other things, memory, executive functioning, and language-related abilities. Defendant also scored in the mildly impaired range on the "Cast MR test," which is specifically designed to test trial competency, although Froming acknowledged that that test was "older" and "not a great test." Similarly, when Froming administered the MacArthur Competence Assessment Tool, which also is used to assess trial competence, defendant had "minimal to no impairment" in reasoning and understanding but "clinically significant impairment" in "decisional capacity and the ability to weigh things." Finally, defendant scored between 59 and 65 on multiple IQ tests, which was below the cutoff of 70 for a clinical diagnosis of "mild retardation." In light of the totality of the test results and her own observations of defendant, Froming concluded that defendant was not fit to proceed and likely could never achieve trial competency.
Based on the evidence presented at the competency hearing, we conclude that the trial court had sufficient evidence to support its determination that defendant met the standard for competency to stand trial under ORS 161.360(2). See Simon , 294 Or. App. at 867, 433 P.3d 385 ("We review [competing determinations] only to determine if the record *646 is sufficient to support the decision that the trial court reached."). As recited above, the court found that
"defendant has the ability to communicate with his counsel in a meaningful way. He understands the nature of the proceeding against him, and the role he plays as a defendant in this case. He has the ability to make decisions intelligently that affect his case. And he has adequate memory about the incident and things that will happen in the course of the trial to participate in his defense."
Those findings account for the competency factors codified by ORS 161.360(2) and are supported by evidence in the record-particularly Stover's report and testimony but also elements of Froming's testimony as well. In short, the record contains ample evidence to support the court's conclusion that defendant had a sufficiently rational and factual understanding of the proceedings against him and was able to participate in his defense.
Defendant essentially seeks to have us reweigh the evidence and reach our own conclusions regarding defendant's trial fitness. Certainly, there is evidence in the record that supports defendant's position that he was not fit for trial, including evidence that defendant's rational understanding and capacity to aid and assist in his defense were unsophisticated or below average. Had the trial court weighed the available evidence differently, it perhaps could have concluded that defendant was not competent for trial. But the court, engaging in its role as the trier of fact and ultimate decision-maker, determined that the state presented sufficiently compelling evidence that defendant was, in fact, competent. See id. at 866-67, 433 P.3d 385 (describing the trial court's responsibility for competency determinations). Further, the record reflects that the court adequately considered the relevant statutory and constitutional factors when making that determination. Finally, contrary to defendant's argument on appeal, there is nothing to suggest that the court selectively "cherry-picked" the evidence to support its competency determination. Instead, the record demonstrates that the court looked at the totality of the evidence and determined that the evidence that defendant was fit for trial was more persuasive than evidence to the contrary.
*647 Our task on appeal is not to make an independent determination of defendant's capacity to stand trial. Id. at 867, 433 P.3d 385 ("Our role in reviewing the trial court's [competency] decision is not to reweigh or assess whether the evidence supports factual findings different from those made by the *306 trial court."). The record in this case supports the trial court's determination that defendant was fit to proceed to trial, and we are not convinced that the court was required as a matter of law to reach a different conclusion based upon the available evidence. We therefore reject defendant's first assignment of error.
B. Defendant's Second Assignment of Error
In his second assignment of error, defendant argues that the trial court erroneously denied his motion to suppress statements that he had made to two police officers during his October 9 interrogation because those statements were obtained in violation of defendant's right against self-incrimination under Article I, section 12, of the Oregon Constitution.[6] We review a denial of a motion to suppress for legal error, accepting the court's findings of fact that are supported by constitutionally sufficient evidence in the record. State v. Wilson , 291 Or. App. 581, 583, 422 P.3d 402, rev. den. , 363 Or. 600, 427 P.3d 191 (2018). We review only the evidence presented at the suppression hearing and recite the following facts consistently with the trial court's express and implied factual findings. State v. Norgren , 287 Or. App. 165, 166, 401 P.3d 1275 (2017), rev. dismissed , 363 Or. 40, 419 P.3d 726 (2018).
Defendant and his codefendant, Cain, were arrested on October 5, the night of Bell's murder. The arresting officers read defendant his Miranda rights immediately following his arrest, and defendant acknowledged that he understood his rights. Defendant was then brought to the Union *648 County Jail in La Grande. He was again read his Miranda rights by Officer Retherford and then interrogated by Retherford and Officer Aydelotte. At the start of the interrogation, defendant indicated that he did not want to speak to the officers when Retherford asked if defendant was going to "visit with" them. The officers then spoke to defendant for several minutes. In particular, they told defendant that Cain had pinned the killing on defendant, and they encouraged defendant to give his side of the story. Defendant said very little, did not make any directly inculpatory statements, and did not otherwise invoke his Miranda rights.
Defendant remained in custody in Union County for four days. On October 9, Detectives Anderson and Rookhuyzen arrived to transport defendant to Washington County for his arraignment. The detectives advised defendant of his Miranda rights in the Union County Jail, and defendant confirmed that he understood his rights. The 300-mile drive to Washington County lasted less than five hours. The detectives had no meaningful interactions with defendant during the drive. When they arrived in Washington County between four and five hours later, the detectives interrogated defendant for approximately one hour in a "soft" interrogation room. That is, unlike a jail interview room that may be bare with hard floors and chairs, this interview room was carpeted and had couches. Defendant denied any involvement in the murder but made a number of factually disprovable statements that, as the state concedes, were evidence of defendant's consciousness of guilt. According to the officers, the interrogation was "relaxed" and conversational, and the officers did not resort to aggressive or threatening tactics when questioning defendant. At no point did defendant indicate that he was having trouble understanding the questions asked of him, nor did he appear to be "impaired" in any way. The detectives did not read defendant his Miranda rights immediately prior to or at any time during the interrogation, and defendant never affirmatively waived his Miranda rights.
*307 Defendant moved to suppress the statements that he made following his invocation of his right to remain silent on October 5 as well as all statements made during the October 9 interrogation. At the suppression hearing, the *649 trial court reviewed a video recording of the October 5 interrogation, determined that defendant had unequivocally invoked his right to remain silent when he indicated to the officers that he did not want to speak to them, and suppressed defendant's post-invocation statements.[7]
The trial court also heard testimony from Anderson and Rookhuyzen, who had read defendant his Miranda rights and transported and interrogated defendant on October 9. The court concluded that the October 5 violation did not render defendant's statements on October 9 inadmissible. Further, the court determined that the officers provided defendant with a Miranda warning prior to the October 9 interrogation and that defendant had validly waived his Miranda rights. The court then denied defendant's motion to suppress statements made during the latter interrogation.
Defendant raises two arguments on appeal. First, he contends that any statements that he made under interrogation on October 9 must be suppressed as the product of the undisputed Miranda violation on October 5. Second, he asserts that the temporal gap between the Miranda warning on October 9 and the interrogation that followed, when considering the totality of the circumstances, rendered his implicit Miranda waiver involuntary. We address each contention in turn.
To protect the right against self-incrimination guaranteed by Article I, section 12, police officers must give Miranda warnings to persons in custody or other compelling circumstances. State v. McAnulty , 356 Or. 432, 454-55, 338 P.3d 653 (2014) (citing Miranda v. Arizona , 384 U.S. 436, 473-74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ). If a person unequivocally invokes his or her right to remain silent, police must honor that invocation and immediately cease all questioning. Id. at 455, 338 P.3d 653. On appeal, the state does not challenge the trial court's ruling that defendant unequivocally *650 invoked his right to remain silent on October 5 when he indicated that he did not want to talk and that Retherford and Aydelotte violated that right when they continued to question him. We proceed under the assumption that the officers violated defendant's right to remain silent, although we do not separately decide the issue.
Even if an officer violates Miranda by continuing to question a suspect after he or she has invoked the right to remain silent, the suspect retains the ability to later waive his or her Miranda rights "as long as that waiver is knowing, intelligent, and voluntary under the totality of the circumstances." Id . A caveat is that, in some circumstances, a Miranda waiver may be tainted by a prior Miranda violation. To protect against that risk, the trial court must suppress statements made in direct response to an impermissible post-invocation interrogation as well as "evidence that derives from or is a product of that constitutional violation," which may include statements made by the defendant at subsequent interrogations. State v. Jarnagin , 351 Or. 703, 713, 277 P.3d 535 (2012). Such evidence must be suppressed because it cannot properly be seen as the product of a truly voluntary waiver of the right against self-incrimination.
In evaluating whether a waiver of the right to remain silent following a Miranda violation is truly voluntary, we consider such relevant factors as
"the nature of the violation, the amount of time between the violation and any later statements, whether the suspect remained in custody before making any later statements, subsequent events that may have dissipated the taint of the earlier violation, and the use that the state has made of the unwarned statements."
*308 Id. at 716, 277 P.3d 535. The inquiry is fact intensive and requires us to decide "whether, considering all the circumstances, a defendant's later decision to speak to officers is sufficiently a product of an earlier Miranda violation that suppression is necessary to vindicate the defendant's Article I, section 12, rights." Id. at 717, 277 P.3d 535.
Applying that framework to this case, we conclude that defendant voluntarily waived his rights on October 9 and that his statements were not derived from or a product *651 of the Miranda violation on October 5. We first consider the nature of the violation. Id. at 716, 277 P.3d 535. We acknowledge that the severity of the violation on October 5 was not insignificant. To ignore a defendant's invocation of the right to remain silent is necessarily a serious infringement on that person's constitutional rights. Even so, the nature of the violation in this case was not especially "flagrant." See id. at 717, 277 P.3d 535. The officers' conduct did not, for example, involve "advis[ing the] defendant of his Miranda rights and then proceed[ing] to question him despite his repeated requests for counsel," id . (citing State v. Mendacino , 288 Or. 231, 238, 603 P.2d 1376 (1979) ), or entail erroneously telling the defendant that he was not yet entitled to an attorney and then subjecting him to "rigorously structured and 'focused' * * * interrogation" that "elicited patently inculpatory responses" despite an unequivocal invocation of Miranda rights, State v. Koch , 267 Or. App. 322, 332, 341 P.3d 112 (2014). Although the interrogation continued for several minutes after defendant invoked his right to remain silent, the officers did not use flagrantly coercive tactics in an effort to elicit an incriminating response. In fact, defendant maintained his innocence throughout the exchange and made no patently inculpatory remarks. For those reasons, and especially in light of the other factors discussed below, the nature of the violation does not weigh heavily in favor of suppressing statements made during the subsequent interrogation.
A related factor is that the Miranda violation did not result in an inadmissible confession that might lead a defendant to believe that he had "let the cat out of the bag" and could "never thereafter [be] free of the psychological and practical disadvantages of having confessed." See Mendacino , 288 Or. at 237, 603 P.2d 1376 (citing United States v. Bayer , 331 U.S. 532, 540-41, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947) ). Because defendant maintained his innocence despite the violation of his Miranda rights, the practical and psychological effects of that violation are less pernicious and less likely to render a future Miranda waiver involuntary.
Jarnagin 's second consideration is temporal. The time between a Miranda violation and a subsequent waiver is relevant because a sufficient temporal gap can "break the causal chain" between the two.
*652 Koch , 267 Or. App. at 332-33, 341 P.3d 112. Here, there was a clear, uninterrupted, multi-day gap between the violation and subsequent questioning, which weighs against suppression. See Jarnagin , 351 Or. at 718, 277 P.3d 535 ("[A] change in time and circumstances can be sufficient to dissipate the effects of an earlier Miranda violation."); cf. State v. Boyd , 360 Or. 302, 321, 380 P.3d 941 (2016) (holding that a Miranda waiver was involuntary where there was "no break at all" between the unlawful interrogation and the waiver); McAnulty , 356 Or. at 458 (holding that a Miranda waiver was involuntary where additional statements were obtained "immediately after" a Miranda violation).
With respect to Jarnagin 's third consideration, defendant remained in custody between the Miranda violation and his subsequent statements on October 9. That fact does weigh in favor of suppression because it increases the likelihood that the violation rendered the subsequent waiver involuntary. See State v. Schrepfer , 288 Or. App. 429, 438, 406 P.3d 1098 (2017) (concluding that the defendant did not voluntarily waive his Miranda rights following a violation thereof, in part because "there was no material change in circumstances and defendant remained in custody throughout the encounter"). However, defendant's ongoing custodial status carries less weight in light of Jarnagin 's fourth consideration-whether subsequent events dissipated the taint of the earlier violation. Here, the second interrogation occurred in an entirely different location and was conducted *309 by different police officers. That change in time, location, and personnel worked to distinguish the two interrogations and dissipate the effects of the Miranda violation. See Mendacino , 288 Or. at 237, 603 P.2d 1376 ("The removal of the improper conditions generally involves a change in time and location sufficient to dissipate the pernicious effects of the unlawful conduct."); cf. McAnulty , 356 Or. at 458, 338 P.3d 653 (holding that the defendant's statements were "an extension of the statements illegally obtained during her first interrogation," in part because "there was no significant temporal break, and the same parties were present in the same room").
In addition, the officers read defendant his Miranda rights hours before the interrogation on October 9. If the Miranda violation on October 5 had the potential to taint *653 subsequent questioning by the police, that risk was mitigated once the officers gave defendant a fresh opportunity to invoke his rights. McAnulty , 356 Or. at 459, 338 P.3d 653 (holding that a Miranda waiver made following several earlier Miranda violations was voluntary, in part because the "defendant was [provided with a fresh Miranda warning] before any [subsequent] statements were obtained"); cf. Jarnagin , 351 Or. at 718, 277 P.3d 535 (holding that a Miranda waiver was involuntary due to an earlier Miranda violation, in part because "[n]o advice of Miranda rights intervened to break the causal chain" between the violation and the waiver).
Jarnagin 's fifth consideration requires us to consider the use that the officers made of defendant's post-invocation statements made on October 5 during the October 9 interrogation. In Jarnagin , for example, the Supreme Court determined that the defendant had not voluntarily waived his Miranda rights when he allowed the police to videotape a reenactment of "the very events that he had described the night before in violation of his [ Miranda ] rights." 351 Or. at 718, 277 P.3d 535. The court explained that suppression of the videotape was necessary despite the defendant's apparent waiver because "[n]ot only did the video reenactment memorialize on film the statements obtained in violation of defendant's rights the night before, but defendant's unwarned statements * * * became, in effect, the script that he acted out the next day while the officers videotaped him." Id. ; see also State v. Moore/Coen , 349 Or. 371, 385, 245 P.3d 101 (2010) (focusing on the state's use of the defendants' unwarned statements at trial to determine whether those statements "tainted" the defendants' subsequent trial testimony).
Here, by contrast, it does not appear that, during the October 9 interrogation, Anderson and Rookhuyzen were even aware of the substance of defendant's post-invocation statements on October 5, let alone exploited anything defendant said or did during the October 5 interrogation. According to Anderson's testimony at the suppression hearing, he knew defendant had been interrogated on October 5 but was unaware of any details of what had been said. Anderson did not know that defendant had possibly invoked his right to remain silent until after he received Retherford's *654 written report on October 29, almost three weeks after Anderson and Rookhuyzen had interrogated defendant. There is no evidence that Anderson and Rookhuyzen meaningfully relied on defendant's post-invocation statements to elicit further statements during the October 9 interrogation. For those reasons, Jarnagin 's fifth consideration weighs against suppression.
In addition to the foregoing argument, defendant also contends that "the delay between the readministration of Miranda warnings in La Grande on October 9 and the interview five hours later in Hillsboro by itself worked a significant constitutional violation." To determine whether a defendant must be re-advised of his or her Miranda rights following an initial warning, "we look at whether, under the totality of the circumstances, a reasonable person could believe that his or her rights have changed since the time they were originally given." State v. Field , 231 Or. App. 115, 121, 218 P.3d 551 (2009). Although the amount of time that elapsed between a Miranda warning and a subsequent interrogation is relevant to that inquiry, there is no "per se rule that a suspect must be re-advised" of his or her *310 Miranda rights "based merely on the passage of time." Id .
Here, defendant was read his Miranda rights approximately five hours before the October 9 interrogation and acknowledged that he understood his rights. Although that is not an insignificant amount of time, we have previously determined that similar gaps did not require police to readminister Miranda warnings. See, e.g. , State v. Hurtado-Navarrete , 258 Or. App. 503, 508-09, 309 P.3d 1128, rev. den. , 354 Or. 656, 318 P.3d 1144 (2013) (police not required to readminister Miranda warnings before custodial interrogation when warnings were given "less than a day" before the interrogation); Field , 231 Or. App. at 122, 218 P.3d 551 (police not required to readminister Miranda warnings before custodial interrogation when warnings were given "several hours" before the interrogation).
Additionally, the warning given to defendant was not limited in scope, and there was no implication that defendant could not invoke his rights at any time he chose. Cf. Hurtado-Navarrete , 258 Or. App. at 510, 309 P.3d 1128 (police not required *655 to readminister Miranda warnings before custodial interrogation, in part because "none of [the prior] warnings were limited in scope"). Finally, Anderson and Rookhuyzen administered the October 9 warning and also conducted the subsequent interrogation, the subject matter of the interrogation-whether defendant was involved in Bell's murder-was the sole basis for defendant's interactions with the officers, and defendant was never outside the presence of Anderson and Rookhuyzen from the time they advised him of his Miranda rights until the interrogation began. Cf. id. (police not required to readminister Miranda warnings, in part because "the last warning was given in circumstances that were materially indistinguishable from those in which the later statements were made; that is, both involved interrogations conducted by the same two detectives regarding the same subject matter"). Under those circumstances, a reasonable person could not believe that his or her Miranda rights had changed since the warning was provided.
Assuming that the police violated defendant's right to remain silent on October 5 when they continued to question him after he invoked that right, we conclude that any statements that defendant made during the October 9 interrogation were not "derived from" or "a product of" that earlier constitutional violation. In addition, defendant was given Miranda warnings approximately five hours before the October 9 interrogation, and the totality of the circumstances did not require the police to readminister Miranda warnings closer in time to the interrogation. There was also constitutionally sufficient evidence for the trial court to find that defendant had knowingly and voluntarily waived his right to remain silent on October 9. For those reasons, we conclude that the trial court did not err when it denied defendant's motion to suppress. We therefore reject defendant's second assignment of error.
C. Defendant's Fifth Assignment of Error
In his final assignment of error, defendant argues that sentencing a person with intellectual disabilities to life in prison without the possibility of parole, as occurred here, constitutes cruel and unusual punishment proscribed by the Eighth and Fourteenth Amendments to the United States *656 Constitution.[8] Specifically, defendant contends that recent United States Supreme Court case law compels the conclusion that an intellectually disabled defendant, based on that status alone, cannot be sentenced to life without parole. For its part, the state does not contest that defendant has an intellectual disability but contends that that case law upon which defendant relies does not compel the result that defendant seeks. As discussed below, we reject defendant's argument that United States Supreme Court case law prohibits defendant's sentence. *311 The prohibition on cruel and unusual punishment "guarantees individuals the right not to be subjected to excessive sanctions." Roper v. Simmons , 543 U.S. 551, 560, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). The concept of proportionality is central to that right. Graham v. Florida , 560 U.S. 48, 59, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). In recent years, the United States Supreme Court has limited the imposition of the death penalty and life sentences without parole for certain categories of individuals.
That development in the Court's Eighth Amendment jurisprudence began with Atkins v. Virginia , in which the Court held that the execution of "mentally retarded" criminals is cruel and unusual punishment prohibited by the Eight Amendment.[9] 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). In reaching that conclusion, the Court explained that "retribution and deterrence" were the primary purposes served by the death penalty, and there was a "serious question as to whether either justification * * * applies to mentally retarded offenders." Id. at 318-19, 122 S.Ct. 2242 (citing Gregg v. Georgia , 428 U.S. 153, 183, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) ). With respect to the former purpose, the Court reasoned that "the lesser culpability of the mentally retarded offender surely *657 does not merit that form of retribution," which is otherwise reserved only for the most "depraved" murderers. Id. (citing Godfrey v. Georgia , 446 U.S. 420, 433, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) ). With respect to deterrence, the Court explained that "the same cognitive and behavioral impairments that make mentally retarded defendants less morally culpable * * * also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information." Id. at 320, 122 S.Ct. 2242.
The Court subsequently extended additional Eighth Amendment protections to juvenile offenders. In Miller v. Alabama , 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), the Court considered whether a juvenile offender could face a mandatory sentence of life without the possibility of parole following a conviction for murder. The Court recognized "two strands of precedent reflecting [its] concern with proportionate punishment." Id. at 470, 132 S.Ct. 2455. The first strand involves "categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty." Id . Examples include Atkins , which held that imposing the death penalty on intellectually disabled defendants violates the Eighth Amendment; Roper , which held that the Eight Amendment bars capital punishment for juveniles; and Graham , which held that the Eighth Amendment also prohibits a sentence of life without the possibility of parole for juveniles who committed nonhomicide offenses. See id . (summarizing those decisions).
The Miller Court explained that Graham also analogized "life without parole for juveniles to the death penalty itself, thereby evoking a second line of [the Court's] precedents." Id . Those cases are ones where the Court has "prohibited mandatory imposition of capital punishment, requiring that sentencing authorities consider the characteristics of a defendant and the details of his offense before sentencing him to death." Id. (citing Lockett v. Ohio , 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and Woodson v. North Carolina , 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) ). That is, the Court required "individualized sentencing when imposing the death penalty." Id. at 475, 132 S.Ct. 2455. To that end, "capital defendants [must] have the opportunity to advance, and the *658 judge or jury a chance to assess, any mitigating factors, so that the death penalty is reserved only for the most culpable defendants committing the most serious offenses." Id . at 475-76, 132 S.Ct. 2455. Of particular note, "the background and mental and emotional development of a youthful defendant must be duly considered in assessing his culpability." Id. at 476, 132 S.Ct. 2455.
By that same logic, the Miller Court determined that mandatory life-without-parole sentencing schemes for juvenile offenders *312 impermissibly "preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." Id . To alleviate that concern, the Court held that the sentencing authority must have the opportunity to make an individualized determination whether a sentence of life without parole is appropriate when a juvenile is convicted of homicide. Id. at 479, 132 S.Ct. 2455 ; see Kinkel v. Persson , 363 Or. 1, 15-16, 417 P.3d 401 (2018) (summarizing individualized sentencing requirement announced in Miller ). The Court cautioned that "appropriate occasions for sentencing juveniles to [life without the possibility of parole] will be uncommon," particularly because of the "great difficulty * * * of distinguishing at this early age between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." 567 U.S. at 479, 132 S.Ct. 2455. The Court, however, did not consider the defendant's "alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those age 14 and younger." Id .
Later, in Montgomery v. Louisiana , --- U.S. ----, 136 S.Ct. 718, 193 L.Ed.2d 599 (2016), the Court concluded that Miller announced a substantive limitation as well as a procedural requirement of individualized sentencing for juveniles convicted of homicide. The Court explained that,
"[e]ven if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crimes reflect 'unfortunate yet transient immaturity.' Because Miller determined that sentencing a child to life without parole is excessive for all but 'the rare juvenile offender whose crime reflects irreparable corruption,' it rendered life without parole an unconstitutional penalty for 'a class of defendants *659 because of their status'-that is, juvenile offenders whose crimes reflect the transient immaturity of youth."
Id. at ----, 136 S.Ct. at 734 (citations omitted).
Here, defendant relies on Atkins and Miller to argue that the Eighth Amendment categorically prohibits the imposition of even a nonmandatory sentence of life without the possibility of parole on intellectually disabled adult homicide offenders based on that status alone. Specifically, he contends that Miller compels the extension of the categorical ban on the death penalty for intellectually disabled offenders announced in Atkins to cases in which intellectually disabled offenders face a potential sentence of life without parole. Intellectually disabled adult offenders, defendant reasons, are similar to juvenile offenders, in that both have underdeveloped brains and are necessarily less morally culpable than nonintellectually disabled adults.
Defendant's argument is unavailing because Supreme Court precedent does not support defendant's proposed constitutional rule. Defendant implicitly argues that Atkins and Miller ineluctably lead to the categorical conclusion that life without the possibility of parole is an unconstitutional sentence for intellectually disabled offenders regardless of their crime of conviction or the sentencing authority's consideration of the defendant's characteristics. But the holding in Atkins was expressly limited to prohibiting the death penalty for intellectually disabled offenders and cannot be read on its own to limit the imposition of less severe penalties. Meanwhile, Miller does not categorically prohibit a sentence of life without parole for juveniles who commit homicide crimes. Instead, as described, Miller proscribes sentencing laws that impose a mandatory life sentence without parole on juvenile homicide offenders but leaves open the possibility of such a sentence where the sentencing authority has adequately considered mitigating circumstances, including the defendant's youth, and determined that the youth's crime reflected "irreparable corruption" rather than the "transient immaturity" of youth. Miller , 567 U.S. at 479, 132 S.Ct. 2455 ; see Kinkel , 363 Or. at 16-17, 417 P.3d 401 (summarizing that aspect of Miller ). In other words, the constitutional problem that the Court resolved in Miller is that mandatory life sentences for juvenile homicide *660 offenders prevent the sentencing authority *313 "from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." 567 U.S. at 474, 132 S.Ct. 2455.
Even if we assume that the same substantive limitations and procedural requirements announced in Miller apply when the court sentences an intellectually disabled adult homicide offender, defendant does not argue that the trial court erred with respect to its adherence to those limitations or requirements. He does not, for example, contend that the trial court failed to make an individualized sentencing determination on the record or argue that the jury or court declined to account for defendant's intellectual disability when imposing its sentence.[10] Defendant instead argues that Miller requires a categorical constitutional bar on life-without-parole sentences for the intellectually disabled. Even the broadest reading of Miller and the Supreme Court's related jurisprudence does not compel such an outcome.
III. CONCLUSION
To summarize, we first conclude that the trial court did not err when it determined that defendant was fit to proceed to trial. The court adequately considered the *661 appropriate competency factors supplied by state and federal law, and its ultimate determination was supported by sufficient evidence in the record. Second, the court did not err when it denied defendant's motion to suppress statements made during the October 9 interrogation. The evidence presented at the suppression hearing supported the court's conclusion that defendant voluntarily waived his Miranda rights. Finally, the United States Supreme Court has not concluded either directly or by implication that the Eighth Amendment categorically prohibits sentencing an adult homicide offender with intellectual disabilities, like defendant, to life in prison without the possibility of parole. As a result, the trial court did not err in rejecting defendant's argument to the contrary and imposing the jury's sentence of life without the possibility of parole.
Affirmed.

Cain was tried separately from defendant and convicted of first-degree manslaughter.

We reject defendant's third and fourth assignments of error without further written discussion.

The Eighth Amendment bars the infliction of "cruel and unusual punishment."

A defendant convicted of aggravated murder in Oregon may be sentenced to death if the state chooses to pursue that penalty. ORS 163.105(1)(a). Due to defendant's intellectual disability, the state did not seek the death penalty in this case. See Atkins v. Virginia , 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding that the Eighth Amendment prohibits sentencing intellectually disabled offenders to death).

ORS 161.370 provides, in part:
"(1) When the defendant's fitness to proceed is drawn in question, the issue shall be determined by the court. * * * If the finding [in the report regarding defendant's fitness to proceed prepared by the certified evaluator pursuant to ORS 161.365 ] is contested, the court shall hold a hearing on the issue. If the report is received in evidence in the hearing, the party who contests the finding has the right to summon and to cross-examine any psychiatrist or psychologist who submitted the report and to offer evidence upon the issue. Other evidence regarding the defendant's fitness to proceed may be introduced by either party."

Article I, section 12, provides, in relevant part, that "no person shall * * * be compelled to testify against himself." Defendant briefly references the same right under the Fifth Amendment to the United States Constitution, but he does not provide any distinguishable argument or analysis under the federal right. The state also does not undertake any separate analysis. We therefore limit our review to the right under the Oregon Constitution. See State v. Turnidge , 359 Or. 364, 399 n. 21, 374 P.3d 853 (2016) ("On review, defendant only briefly cites the Fifth Amendment and does not offer any developed argument in support of his reliance on it. We therefore do not address it.").

The precise nature of those statements is uncertain based on the record from the suppression hearing. The trial court watched a video recording of the interrogation only up to the point where defendant invoked his right to remain silent. There is no indication that the court also was provided with a transcript of the interrogation or otherwise reviewed what defendant said to the police after invoking his rights under Miranda .

The Fourteenth Amendment applies the Eighth Amendment prohibition on cruel and unusual punishment to the states and forms the basis of defendant's argument. In his opening brief, defendant does not also base his argument on appeal on Oregon's constitutional prohibition on disproportionate sentences, Article I, section 16. Thus, we do not address any issue under the Oregon Constitution.

For the purpose of this opinion, "mentally retarded" and "intellectually disabled" are synonymous terms. The latter is a contemporary variation of the former that represents a societal improvement in terminology rather than a clinical or diagnostic change.

Defendant was sentenced under ORS 163.105, which provides sentencing options for aggravated murder. The sentencing proceeding is conducted "before the trial jury as soon as practicable" after the guilt phase. ORS 163.150(1)(a). The sentencing options are "death, life imprisonment without the possibility of release or parole or life imprisonment." ORS 163.105(1)(a). The statute goes on to establish that a sentence of "life imprisonment" means that the court "shall order that the defendant shall be confined for a minimum of 30 years without possibility of parole, release to post-prison supervision, release on work release or any form of temporary leave or employment at a forest or work camp." ORS 163.105(1)(c). Following that minimum period of confinement, the state Board of Parole and Post-Prison Supervision may convert the defendant's sentence to "life imprisonment with the possibility of parole, release to post-prison supervision or work release" if the board finds that "the prisoner is capable of rehabilitation." ORS 163.105(3). Here, the jury chose life imprisonment without the possibility of parole and the trial court refused to impose a lesser sentence. See ORS 163.150(2) (discussing jury's consideration of sentence in aggravated murder trial). The jury considered a number of mitigating factors presented to them by defendant during the sentencing phase, including defendant's intellectual disability. Defendant does not contend that the sentencing authority failed to consider his intellectual disability in sentencing or that his particular circumstances could not lead to a true life sentence. We do not address those issues. Rather, we reject defendant's categorical argument.