Submitted October 15, 2019; sentence vacated and remanded for resentencing, otherwise affirmed August 12, 2020

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

STEVEN LEVI RYAN,
*Defendant-Appellant.*

Marion County Circuit Court
13C43883; A167593

473 P3d 90

Defendant, who is intellectually disabled, challenges his sentence following resentencing. The trial court originally had imposed a mandatory sentence of 75 months' imprisonment upon defendant's guilty plea to first-degree sexual abuse. The Oregon Supreme Court vacated and remanded for resentencing, concluding that the trial court erred under Article I, section 16, of the Oregon Constitution in failing to consider defendant's intellectual disability when determining whether the sentence was unconstitutionally disproportionate. *State v. Ryan*, 361 Or 602, 604, 396 P3d 867 (2017). On remand, the trial court imposed the same sentence, emphasizing evidence that defendant was neither incompetent to stand trial nor guilty except for insanity (GEI). Defendant appeals, arguing that the court again failed to consider intellectual disability in a broad sense when determining proportionality. *Held*: Although relevant, the standards for trial competency and GEI do not fully consider the spectrum of intellectual disability and how it may reduce, while not eliminate, criminal culpability or blameworthiness. Where the trial court has found a defendant seriously intellectually impaired, it must consider that intellectual disability in assessing the defendant's culpability in order to assure that the sentence is constitutionally proportionate.

Sentence vacated and remanded for resentencing; otherwise affirmed.

Claudia M. Burton, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and David O. Ferry, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Timothy A. Sylwester, Assistant Attorney General, filed the brief for respondent.

Before DeHoog, Presiding Judge, and DeVore, Judge, and Mooney, Judge.

DeVORE, J.

Sentence vacated and remanded for resentencing; otherwise affirmed.

**DeVORE, J.**

Defendant, who is intellectually disabled, challenges his sentence following resentencing. The trial court originally had imposed a mandatory sentence of 75 months' imprisonment upon defendant's guilty plea to first-degree sexual abuse—one of the charges on which he was convicted. The Oregon Supreme Court vacated and remanded for resentencing, concluding that the trial court erred under Article I, section 16, of the Oregon Constitution in failing to consider defendant's intellectual disability in relation to the age threshold for criminal liability when determining whether the sentence was unconstitutionally disproportionate. *State v. Ryan*, 361 Or 602, 624-25, 396 P3d 867 (2017). On remand, the trial court imposed the same sentence emphasizing evidence that defendant was neither incompetent to stand trial nor guilty except for insanity (GEI). Defendant appeals, arguing that the court again failed to consider intellectual disability in a broad sense when determining proportionality.

We agree that the evidence related to the GEI defense and competency to stand trial is relevant, but that those standards do not fully consider the spectrum of intellectual disability and the potential that intellectual disability may reduce, while not eliminate, criminal culpability or blameworthiness. Where the trial court has found that defendant is intellectually impaired, as here, the court must consider defendant's intellectual disability in order to assure that the sentence is constitutionally proportionate—that the sentence fits the crime. Accordingly, we are required to vacate the sentence and remand for resentencing.

## I.   PROCEDURAL HISTORY

A.   *Standard of Review*

"We review for legal error the trial court's conclusion that defendant's sentence was constitutional under Article I, section 16." *Ryan*, 361 Or at 614-15. "In conducting that review, we are bound by any findings of historical fact that the trial court may have made, if they are supported by evidence in the record." *Id.* at 615.

B.   *Defendant's First Sentencing*

Prior to the offenses in this case, defendant committed criminal mischief by masturbating into an item of children's clothing in a store's dressing room. He was on probation for that offense when, in July 2013, defendant engaged in sexual contacts with a nine-year-old girl and a 14-year-old girl. He pleaded guilty to first-degree sexual abuse of the younger child, ORS 163.427(1)(a)(A), and three counts of third-degree sexual abuse as to the older child, ORS 163.415.

Facing the prospect of a mandatory sentence of 75 months' imprisonment on the charge of first-degree sexual abuse, *former* ORS 137.700(2)(a)(P) (2013), *renumbered as* ORS 137.700(2)(a)(Q) (2019), defendant argued that, due to his intellectual disability, the sentence would shock the moral sense of reasonable people and be unconstitutionally disproportionate under Article I, section 16, of the Oregon Constitution and the Eighth Amendment to the United States Constitution as applied to him.[1] To support that argument, he provided the court with written reports from four mental health evaluations performed between 2008 and 2013. The Supreme Court described those evaluations in its opinion in the prior appeal of this case:

"All the evaluators diagnosed defendant with intellectual disabilities. The first evaluator reported an IQ score of 50 for defendant, the most recent IQ test scored defendant at 60, and each evaluator found significant impairment in his adaptive functioning. * * *

"More specifically, the first evaluation—performed when defendant was 17 and living in an adolescent group home— was part of an effort to secure services for defendant based on his developmental delay. The evaluator, Dr. Sacks, noted that defendant had a history of striking out at others and that, between 2001 and 2006, he had engaged in misconduct that 'seemed to increase in severity.' Sacks diagnosed defendant with Conduct Disorder and Reactive Attachment

_____

[1] Those provisions provide, in relevant part, that "Cruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense," Or Const, Art I, § 16, and that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted," US Const, Amend VIII.

Disorder and stated that defendant needed a residential setting with highly developed structure to avoid impulsive and dangerous acts.

"The second evaluation was performed in 2012, when defendant was 21, to determine whether he was able to aid and assist in his defense on the criminal mischief charge. The evaluator, Dr. Stoltzfus, diagnosed defendant with low cognitive functioning, attention deficit hyperactivity disorder (ADHD), and Conduct Disorder. Stoltzfus reported that defendant had been placed in foster care at age 12 for kissing a seven-year-old girl and that he primarily had lived in group home settings between the ages of 12 and 21. In his interview with Stoltzfus, defendant made repeated references to aggression toward people who made him angry. Stoltzfus opined that defendant had a high degree of impulsivity and reactive hostility that could be ameliorated to some extent with psychotropic medication, but that '[h]is low cognitive and low adaptive functioning are not amenable to treatment and will never change.' Stoltzfus concluded that defendant was not then capable of aiding and assisting his defense. As a consequence, defendant was placed in the Oregon State Hospital for further evaluation and treatment.

"In December 2012, Dr. Corbett evaluated defendant at the state hospital. He noted that defendant had been placed in nonrelative foster care for extended intervals between 2005 and 2008, and that he had received services for his developmental delay in Marion County from 2006 to 2009. Defendant stated that he had been so angry at the hospital that he wanted to hit people, but Corbett noted that defendant had made some progress in 'competency restoration education.' Corbett opined that defendant had made sufficient progress that he was then able to aid and assist in his defense.

"Finally, in December 2013, Dr. Nance evaluated defendant for his sentencing in this case. Nance noted the allegation that defendant had violated his probation on the criminal mischief charge by possessing pornography and engaging in improper internet use. Defendant was in jail at the time of his evaluation and told Nance that he did not feel safe there. He described suicidal and homicidal thoughts, but denied that he would act on them.

"Nance diagnosed defendant with limited intellectual functioning and as being immature, paranoid, and depressed,

and having questionable judgment. On account of his intellectual deficiencies, defendant was unable to take a useful polygraph examination, which was a concern to Nance, because mandated polygraphs are a primary tool of community supervision. According to Nance, defendant was at high risk for re-offending, because he had a sense of sexual entitlement with 'rape attitudes,' some hostility toward women, and a lack of concern for others. So far, Nance opined, defendant had expressed an attitude that did not support probation. In Nance's view, defendant posed a high risk to commit a similar or more serious crime and was not a suitable candidate for community supervision. Defendant's prognosis for 'full rehabilitation' was poor to fair, Nance opined, but good for 'some benefit from support-ive therapy.' Nance recommended a lengthy course of court-mandated sex offender treatment and stated that the court 'may consider' a group home that would administer psy-chotropic medications and ultimately support defendant's community supervision. Nance opined that the antisocial aspect of defendant's disorder would be exacerbated if he were to be incarcerated."

*Ryan*, 361 Or at 606-08. During that first sentencing hear-ing, defendant's attorney also argued to the court that defendant's aunt believed defendant functioned at a mental age of about 10. *Id.* at 606. In its opinion, the Supreme Court recited that argument as if it were evidence in the record. *Id.*

In his initial sentencing, the trial court found that defendant was intellectually disabled, but the court con-cluded that the statutorily mandated sentence was not dis-proportionate. The court did not indicate that it had consid-ered defendant's intellectual disability in its determination. *Id.* at 609-10. The court sentenced defendant to the 75-month prison term. *Id.* at 609.

C.   *Defendant's First Appeal*

On appeal, defendant raised an as-applied chal-lenge to the 75-month prison sentence under the state and federal constitutions. *Id.* at 610. He argued that the trial court erred in failing to sufficiently consider his intellectual disability in assessing the proportionality of the mandatory sentence. *Id.* Defendant highlighted, in part, his lessened

culpability and his heightened vulnerability to abuse and other adverse effects in the prison setting. *Id.* We affirmed without opinion. *Id.*

On review, the Oregon Supreme Court concluded that the trial court erred in its evaluation of the gravity of defendant's offense with the severity of the sentence, in violation of Article I, section 16, by "failing to consider evidence of defendant's intellectual disability when that evidence, if credited, would establish that the sentence would be arguably unconstitutional because it shows that defendant's age-specific intellectual capacity fell below the minimum level of criminal responsibility for a child."[2] *Id.* at 625-26. In so saying, the court relied on defense counsel's argument that defendant functioned as a 10-year old and referred to ORS 161.290(1), which makes age 12 the threshold for criminal liability of a minor.[3] *Id.* at 623-24. The Supreme Court vacated and remanded for resentencing. *Id.* at 626.

D.   *Defendant's Second Sentencing*

On remand, the trial court had before it largely the same evidence as before. In addition, defendant introduced two evaluations by Dr. Stoltzfus from September 2013 and November 2017. The 2017 assessment showed that defendant's full scale IQ was 72, representing a "minor and inconsequential" improvement in scores. The doctor opined that defendant still met "the criteria for an intellectual disability (previously labeled Mental Retardation)."

The trial court wrestled with the appellate directive to evaluate defendant's intellectual capacity in relation to a minor's threshold of criminal liability when evaluating the gravity of the offense and severity of the penalty. The court found that defendant had an intellectual disability. It predicated that finding on Dr. Stoltzfus's opinion in 2017, based on the "entire picture," that defendant had an intellectual disability, and on evidence "throughout his evaluations."

---

[2] Given that disposition, the Oregon Supreme Court did not reach the Eighth Amendment challenge.

[3] That statute provides:

"A person who is tried as an adult in a court of criminal jurisdiction is not criminally responsible for any conduct which occurred when the person was under 12 years of age."

The trial court was uncertain what evidence led the Oregon Supreme Court to posit that defendant may function at an age level below that of criminal responsibility, other than reference to his low reading and mathematics proficiency scores.[4] The court asked whether there was "some other evidence in the record that he functions below the age at which one can be subject to criminal responsibility." Defense counsel pointed, generally, to his sentencing memorandum and the evaluations. The court did not appear to find support for the statement in the record that defendant functioned like a 10-year old. But, based on the evaluations, the court found that defendant "met the criteria for intellectual disability."

Despite that intellectual disability, the trial court determined that the sentence was proportionate as applied to defendant. To explain, the court cited determinations in the 2013 and 2017 evaluations by Dr. Stoltzfus that defendant "did not meet the criteria for what we would call guilty except for insanity." The court acknowledged that, "in this case, we're not talking about insanity," but it found, "based on those reports by Dr. Stoltzfus and in the absence of any contrary evidence," that defendant "was able to appreciate the criminality of his conduct and was able to conform his conduct to the requirements of the law, despite his intellectual deficits." The court noted that reports by Dr. Stoltzfus in 2013 and the Oregon State Hospital in 2012 stated that defendant was "able to aid and assist in his defense." Based on the Oregon State Hospital evaluation, the court also found that defendant "scored 100 percent on a legal concepts tests," whereas the "average mentally retarded individual scored 73.2 and 71.3 percent." The court found that defendant had "the ability to understand the charges against him, to understand the nature of the proceedings in court, to cooperate with his attorney and to assist his attorney," to

---

[4] We understand the Oregon Supreme Court to have been referencing the following representation by defense counsel to the trial court at defendant's initial sentencing:

"The person that's probably been the most meaningful support for him, who I believe was out of town, and couldn't be here today—she was at our last court appearance—is his aunt. She was his payee for his social security. I've had several conversations with her. In her lay opinion, she puts [defendant] at, you know, a mental age of 10."

"identify the pleas that could be entered in court," to "identify the roles and responsibilities of the major courtroom participants," and to "describe typical probation conditions such as no alcohol."

Speaking candidly, the trial court expressed uncertainty about "what really is the relevance of his intellectual disability, given that he does not meet the criteria for guilty except for insanity." The court elaborated, stating,

"I find that, notwithstanding his intellectual disability, [defendant] is able to appreciate the criminality of his conduct. And he's able to conform his conduct to the requirements of the law, should he choose to do so.

"So, you know, that being the case, it's difficult for the Court to understand why it would shock the conscience of the Court to impose the same sentence on someone who says criteria and is—has an intellectual disability as opposed to someone who is also able to appreciate the criminality of their conduct and able to conform their conduct to the requirements of the law but has a higher IQ.

"*I mean, the whole point of diminished capacity or of an intellectual disability in the Court's view in terms of culpability is can the offender understand what they're doing.* Can they understand that it is wrong. Can they understand it is a crime. And all of the evidence is that [defendant] could and did.

"To the extent that the Supreme Court mentions that there's evidence in the record that [defendant] functions again at an age level below the age of criminal responsibility in the State of Oregon and again, as far as I can tell, what they're referring to in the record is the evidence as to his reading and math scores where he consistently scores in about the first and second grade.

"I guess I would say two things. I have no evidence in the record from any of the experts indicating that his deficits in terms of academic performance in terms of math or reading and writing, that those deficits in any way impaired his ability to understand the criminality of what he was doing, to understand that what he was doing was wrong or impaired his ability to conform his conduct to the law.

"* * * * *

> "[T]here are different kinds of intelligence. And it is clear that, you know, [defendant's] not a good candidate to hire for a job that's going to require him to do Excel spreadsheets and write letters. His math abilities and his write—reading and writing abilities are extremely limited.
>
> "But I do not believe, in the absence—particularly in the absence of any expert evidence making that connection, I do not believe that it therefore logically follows that he has less criminal culpability again where the evidence is that he can understand that this conduct is illegal and he can conform his conduct to the requirements of the law."

(Emphasis added.) In short, the trial court appears to have determined that defendant's intellectual disability does not play a role in its assessment of the proportionality of the mandated sentence.

That said, the court did assess other aspects of the gravity of defendant's conduct. The court observed that, although the conduct was not "the worst thing you can do and still be charged with sex abuse one," it did not "resemble the conduct in *Rodriguez* and *Buck* where you had very brief \*\*\* contact of which the victims may not even have been aware." The conduct involved violence, and it demonstrated an intent to go farther. The court underscored the "significant impact" on the victim; the young girl had to "fight to defend herself," and she testified to being "the most scared that she had ever been."

The court explained that its concern was "not so much culpability in terms of retribution" as ensuring public safety and the "protection of society." The court discussed evidence that defendant needed residential placement due to the risk that he posed to himself and others, and the lack of viable options that could provide sufficient security. It noted an expert evaluation indicating that defendant's behavior "may escalate." The court questioned the potential efficacy of treatment as an alternative to incarceration, given defendant's prior failure to follow through, his lack of motivation to engage, and his inability to take responsibility for his actions.

The court highlighted defendant's criminal record, which included a crime that, "although not technically a sex offense," had "a sexual offense component." Defendant had

been "on probation with sex offender conditions," with which "he never complied." "It's clear," the court found, that defendant "didn't take his probation seriously."

Given all those considerations, the court determined that the original sentence was proportionate. It reasoned that, if defendant "doesn't get the penalty that exists under law for this behavior, the message is you don't have to follow the law. You don't have to do what the law requires because we understand that you have an intellectual disability." The court said, "sending that message to [defendant] is going to do nothing but give him permission to reoffend and offend in worse ways." It concluded that the penalty did not shock the conscience, and it again imposed the mandatory minimum sentence of 75 months' imprisonment.

E.   *Arguments on Appeal*

On this second appeal, defendant challenges his sentence again. He stresses that, under *State v. Rodriguez/ Buck*, 347 Or 46, 217 P3d 659 (2009), and *Ryan*, 361 Or 602, a proper proportionality analysis requires broad consideration of any intellectual disability because any intellectual disability should reduce defendant's culpability in relation to the penalty. Defendant contends that the trial court conflated the criminal liability with culpability, when it reasoned that his competence to stand trial or his inability to interpose a GEI defense meant that he could receive the same sentence as a person with a "higher IQ." Defendant argues that the analyses for criminal liability and culpability must differ. He argues that the Supreme Court contemplated that his reduced culpability may require a different sentence, despite his ability to stand trial, and that intellectual disability reduces the relative culpability of defendants who stand trial. Defendant argues that the trial court should have focused, as the Supreme Court did, on his deficits in adaptive functioning.[5] Defendant concludes

---

[5] The *Ryan* opinion explained,

"Impairment in adaptive functioning' refers to significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales."

361 Or at 606 n 1 (internal quotation marks and citations omitted).

that, because the trial court failed to appreciate the impact of his intellectual disability on his potential culpability, its proportionality analysis remained flawed, was inconsistent with *Ryan,* and reached an unconstitutional conclusion.

The state responds that the trial court properly imposed the sentence. The state argues that the trial court did consider evidence of defendant's intellectual disability when examining his IQ score and adaptive functioning, and when determining, as the state characterizes it, that defendant's "culpable mental state" was "on the borderline" for criminal liability. The state notes that the court found that defendant met the standard for competency and that he was able to appreciate the criminality of his conduct and conform his conduct to the law. The state notes other relevant factors that the court considered—a prior offense and danger to society—and concluded that, in the totality of the circumstances, the mandated 75-month sentence does not shock the moral sense of reasonable people. The state asserts that "the only question that is presented here reduces to this: does the fact that defendant has an intellectual disability mean that a 75-month minimum sentence mandated by ORS 137.700(2)(a)(P) is necessarily unconstitutionally disproportionate punishment *as applied* to him?" (Emphasis in original.)

We understand the question presented somewhat differently than do defendant and the state. Contrary to defendant, we already know from the prior *Ryan* decision that the answer does not mean that *any* intellectual impairment invariably reduces a defendant's culpability or the offense's gravity. *Ryan*, 361 Or at 621 (rejecting one-size-fits-all approach); *id.* at 625-26 (referencing the threshold for criminal liability); *see also id.* at 626-27 (Balmer, J., concurring) (describing majority's holding as being narrower than defendant's argument). In this case, however, the trial court has accepted a record that indicates that the defendant has a serious intellectual disability, including significantly impaired adaptive functioning and an IQ score that falls within the range which the United States Supreme Court has recognized as potentially diminishing culpability. *Id.* at 623 (citing *Hall v. Florida,* 572 US 701, 721-23, 134 S Ct 1986, 188 L Ed 2d 1007 (2014)). Contrary to the

state, defendant does not argue that intellectual disability *necessarily* renders a sentence under ORS 163.427(1)(a)(A) unconstitutional. We need not determine, as the state suggests, whether defendant's intellectual disability *requires* a lesser sentence.

Rather, we are asked whether evidence of a defendant's competency to stand trial and his inability to interpose a GEI defense suffice as consideration of intellectual disability when assessing the defendant's culpability and the gravity of an offense in relation to severity of the penalty in the proportionality analysis under Article I, section 16. As we explain, we conclude that those measures do not suffice to determine proportionality and, further, that the serious intellectual disability that has been determined requires evaluation of defendant's relative culpability as part of the gravity of the offense in determining proportionality. To put the question in perspective, we visit the standards for proportionality, Or Const, Art I, § 16, trial competency, ORS 161.360, and the GEI defense, ORS 161.295.

## II. LAW

### A. *Proportionality and Intellectual Disability*

The Oregon Constitution prohibits cruel and unusual punishments, and it requires that all penalties be proportioned to the offense. Or Const, Art I, § 16. In considering the proportionality of a sentence, we ordinarily ask "whether the length of the sentence would shock the moral sense of reasonable people." *Ryan*, 361 Or at 612 (citing *State v. Althouse*, 359 Or 668, 683, 375 P3d 475 (2016)). In *Rodriguez/Buck*, the Oregon Supreme Court articulated three nonexclusive factors that bear on that inquiry: "(1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant." 347 Or at 58.

The first factor requires the court to compare the penalty's severity with the crime's gravity. *Id.* A "'greater or more severe penalty should be imposed for a greater or more severe offense,'" and, conversely, "'a less severe penalty should be imposed for a less severe offense.'" *Id.* at 62

(quoting *State v. Wheeler*, 343 Or 652, 656, 175 P3d 438 (2007)). In an as-applied challenge, a court may consider case-specific factors in making that assessment. *Id.* Gravity of an offense encompasses both "the gravity of the defendant's particular conduct and the statutorily defined crime itself." *Ryan*, 361 Or at 616. "To the extent that an offender's personal characteristics influence his or her conduct, those characteristics can affect the gravity of the offense." *Id.*

In defendant's first appeal, the Oregon Supreme Court determined that intellectual disability is one such personal characteristic. *Id.* at 615-21. In reaching that conclusion, the court studied *Atkins v. Virginia,* 536 US 304, 122 S Ct 2242, 153 L Ed 2d 335 (2002), in which the United States Supreme Court held that the Eighth Amendment prohibits the execution of intellectually disabled offenders.[6] The Oregon Supreme Court found significant *Atkins*'s concern with diminished culpability, reciting that:

> "The [*Atkins*] Court concluded that, for an intellectually disabled offender, the case for retribution was diminished. Further, it stated, the rationale of deterrence was diminished by the reduced ability of the intellectually disabled 'to understand and process information, to learn from experience, to engage in logical reasoning, and to control impulses.'
>
> "The Court explained:
>
> > 'Those intellectually disabled persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes. Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct. Moreover, their impairments can jeopardize the reliability and fairness of capital proceedings against so diagnosed defendants.'
>
> "Viewing an intellectually disabled offender's culpability in light of the 'penological purposes served by the death

---

[6] The court noted that "[b]ecause the test for proportionality under the Eighth Amendment is similar to that under Article I, section 16, at least in its comparison of the gravity of the offense and the severity of the penalty," federal precedents addressing that constitutional provision could "shed light" on the question presented. *Ryan*, 361 Or at 616-17.

penalty,' the [*Atkins*] Court determined that such defendants 'should be categorically excluded from execution.' Concerning retribution, the Court found that, because 'severity of the appropriate punishment necessarily depends on the culpability of the offender, an exclusion for the intellectually disabled is appropriate.' Culpability also was central to the [*Atkins*] Court's determination that execution of the intellectually disabled did not serve the penological purpose of deterrence, because 'it is the same cognitive and behavioral impairments that make these defendants less morally culpable.' 'Construing and applying the Eighth Amendment in the light of our "evolving standards of decency," the [*Atkins*] Court therefore concluded that such punishment is excessive and that the Constitution "places a substantive restriction on the State's power to take the life" of an intellectually disabled offender.'"

*Ryan*, 361 Or at 618-19 ((quoting *Atkins*, 536 US at 306-07, 317-21) (internal citations, brackets, and ellipses omitted)).

Drawing on that analysis, the Oregon Supreme Court determined that serious intellectual disability is relevant to determining both the gravity of an offense and the severity of its penalty before imposing a prison sentence. *Id.* at 620-21. It acknowledged that lower courts have generally limited *Atkins*'s reach to capital cases. *Id.* at 619. Nevertheless, the court noted the growing consensus that intellectual disability should be a major mitigating factor in determining appropriate sentences. *Id.* at 620. The court observed that "evidence of an offender's intellectual disability therefore is relevant to a proportionality determination where sentencing laws require imposition of a term of imprisonment without consideration of such evidence." *Id.* at 620-21. It recognized that, "where the issue is presented, a sentencing court must consider an offender's intellectual disability in comparing the gravity of the offense and the severity of a mandatory prison sentence on such an offender in a proportionality analysis under *Rodriguez/Buck*." *Id.* at 621.

The Oregon Supreme Court addressed "how that consideration should affect the proportionality analysis," especially given the "broad spectrum of intellectual disabilities that may reduce, but not erase, a person's responsibility

for her crimes." *Id*. A "one-size-fits-all approach is not appropriate," the court said. *Id*. The court explained that

"a sentencing court's findings, among other factual considerations, as to an intellectually disabled offender's level of understanding of the nature and consequences of his or her conduct and ability to conform his or her behavior to the law, will be relevant to the ultimate legal conclusion as to the proportionality—as applied to the offender—of a mandatory prison sentence. *See* [*Atkins*, 536 US] at 319 (holding that 'severity of the appropriate punishment necessarily depends on the culpability of the offender'). The length of the prescribed prison sentence also is relevant in determining the severity of the penalty."

*Id*. (footnote omitted). All things considered, such impairments may make a defendant "less morally culpable." *Id*. at 619 (quoting *Atkins*, 536 US at 320).

Turning to defendant's case, the Supreme Court concluded that the trial court had failed to sufficiently consider his intellectual disability in addressing his proportionality challenge. *Id*. at 623. The Supreme Court recounted:

"[D]efendant is an intellectually disabled offender who has an IQ score between 50 and 60, a full ten to twenty points below the cutoff IQ score for the intellectual function prong of the intellectual disability definition recognized in *Hall*. Moreover, it is undisputed that defendant has significantly impaired adaptive functioning, such that he functions—as it pertains to standards of maturation, learning, personal independence, and social responsibility— at an approximate mental age of 10, two years below the minimum age for establishing criminal responsibility of a child under Oregon law. *See* ORS 161.290(1). That legislative pronouncement is relevant here because it is objective evidence of a societal standard that eschews treating persons with the attributes of a pre-teen child as if they were normally abled adult offenders."

*Id*. at 623-24 (some internal citations and footnote omitted). The court stated that such evidence was relevant to both the gravity of the offense as well as the severity of the penalty. *Id*. at 625 n 14.

The Supreme Court observed that the trial court, despite recognizing defendant's intellectual disability, failed

to "address its implications in rejecting his proportionality challenge." *Id.* at 624. "That missing linkage is problematic," the high court explained, "although the [trial] court appeared to grasp the factual foundation of defendant's argument, it did not fully appreciate its constitutional implications." *Id.* The *Ryan* decision concluded that the trial court erred in comparing the gravity of defendant's offense and the severity of the mandatory sentence under the first *Rodriguez/Buck* factor, because the trial court failed to consider evidence of defendant's intellectual disability "when that evidence, if credited, would establish that the sentence would be arguably unconstitutional because it shows that defendant's age-specific intellectual capacity fell below the minimum level of criminal responsibility for a child." *Id.* at 625-26.

The Supreme Court remanded the case for resentencing. The court explained that, "in certain circumstances where the record suggests that the trial court misapprehended the import of the defendant's proportionality challenge," vacating and remanding for a trial court to resentence the defendant is appropriate because, otherwise "we would have to speculate as to whether the court properly considered the relevant case-specific factors and made any necessary factual findings." *Id.* at 625 n 15.

B.    *The GEI Defense*

The concept that a defendant is guilty except for insanity is reflected as an affirmative defense in Oregon law. ORS 161.305. A person meets the criteria for GEI if, as a result of a qualifying mental disorder at the time of the criminal conduct, the person "lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law." ORS 161.295(1).[7] The word "appreciate" means that the offender must be "'emotionally as well as intellectually aware of the

_____

[7] ORS 161.295, as well as ORS 163.260 (discussed below), have seen revisions in recent years and since the time of defendant's conduct. Or Laws 2017, ch 634, §§ 3, 14 (changing requirement for GEI and incapacitation from having a "mental disease or defect" to having a "qualifying mental disorder"). However, those changes have no bearing on our analysis.

significance of his conduct.'" *State v. J. C. N.-V.*, 359 Or 559, 581, 380 P3d 248 (2016) (quoting Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 36 (July 1970)).

The GEI statute ensures that a qualifying defendant will not be held criminally responsible. When enacted in 1971, the law permitted a finding that a defendant was "not responsible by reason of mental disease or defect." *State v. Olmstead*, 310 Or 455, 463, 800 P2d 277 (1990) (discussing Or Laws 1971, ch 743, § 36). That defense, which became ORS 161.295, "excuse[d] responsibility for a crime of any sort." *Id.* at 464 (internal quotation marks omitted). Likewise, under the current statute, "the concept of the defense is that people who establish it are not criminally responsible for the crime that they otherwise have committed." *Id.* ((citing Minutes, Senate Committee on Judiciary, HB 2070, June 29, 1983) (internal quotation marks omitted)).

The GEI issue is not synonymous with culpability in determining the constitutionality of a sentence under Article I, section 16. A defendant who invokes the GEI defense successfully has a complete defense to all criminal liability. By contrast, a defendant whose intellectual disability reduces culpability in determining the proportionality of a sentence does not escape criminal liability. Consideration of intellectual disability only assures that the court arrives at a sentence that is not unconstitutionally disproportionate. To be sure, the *Ryan* decision recognized that a trial court's findings, such as "an intellectually disabled offender's level of understanding of the nature and consequences of his or her conduct and ability to conform his or her behavior to the law, will be relevant to the ultimate legal conclusion as to the proportionality." 361 Or at 621. But the GEI question and the culpability question are not the same. Indeed, if intellectual disability were to be considered only when the GEI defense is proven, there would be no criminal liability and no constitutional question about the proportionality of the sentence. Put another way, to find that the evidence would not have supported a GEI defense only begs the question of proportionality. It does not render evidence of intellectual disability immaterial.

C.   *Fitness to Proceed*

Under Oregon law, a defendant may be deemed unfit to proceed in his criminal case by reason of incapacity. ORS 161.360(1). A court may find a defendant to be incapacitated if, as a result of a qualifying mental disorder, he is unable to understand the nature of the proceedings against him, assist and cooperate with his counsel, or participate in his own defense. ORS 161.360(2).

Fitness to stand trial is not necessarily determined by intellectual disability. *State v. Ward*, 295 Or App 636, 646, 437 P3d 298, *rev allowed*, 365 Or 556 (2019). For example, in *Ward*, we affirmed a trial court's determination that an intellectually disabled defendant was competent to stand trial. *Id.* at 646. In that case, the defendant suffered from a "lifelong intellectual disability." *Id.* at 639. The trial court determined that the defendant was fit to proceed in his case, based predominantly on the testimony and evaluations of a doctor at the state hospital. *Id.* at 641. That doctor had evaluated the defendant on multiple occasions and noted meaningful improvement to the defendant's ability to communicate and display rational and autonomous decision-making, as shown through the defendant's responses to hypothetical legal scenarios and his interactions with his attorneys. *Id.* at 643-44. The doctor concluded that, although the defendant had a "very real disability" and would need accommodations at trial, he "possessed the ability to adequately process information, communicate with his attorneys, and assist in his defense." *Id.* at 644. On appeal, we concluded that the record supported the findings that the defendant had the ability to communicate with his counsel in meaningful way, to understand the nature of the proceedings against him, to intelligently make decisions affecting his case, and to adequately remember the incident and things that would happen in course of trial so as to participate in his defense. *Id.* at 646-47. Accordingly, we affirmed. *Id.* at 661.

Fitness to stand trial is determined by a statutory standard involving the ability to understand and assist. That standard poses a different question than the assessment of intellectual disability as may affect the culpability

of the defendant or the gravity of the offense. Like evidence on the GEI defense, evidence about defendant's competence to stand trial did not serve to answer the question of the import of defendant's intellectual disability for purposes of the proportionality of his sentence.

## III.   ANALYSIS

When this case was returned for resentencing, the trial court was left to determine *how* intellectual disability affected its assessment of the culpability of defendant or the gravity of the offense in relation to the severity of a mandated term of imprisonment. The *Ryan* decision had considered that evidence of defendant's intellectual disability, seemingly indicated that defendant, with low IQ scores, may function on the level of a 10-year old, below the age at which a minor could be criminally liable. The *Ryan* decision resolved that, if true, the trial court must consider such serious intellectual disability in evaluating defendant's culpability or the gravity of the offense.

The trial court reviewed the evidence. At most, the record revealed that the statement about defendant functioning like a 10-year-old was no more than defense counsel's representation, made in argument in the first sentencing hearing, about what defendant's aunt believes. Asked for such an indication in the record, defense counsel at the second sentencing hearing could offer nothing more. The trial court surmised that the Supreme Court had made an assumption from unusually low scores on tests of reading and mathematics, and the court found better evidence in other measures.

The trial court determined that defendant remained at the level of intellectual impairment that was indicated in the psychological evaluations provided. At the time of the first sentencing, defendant's IQ scores had been 50 to 60. In the 2017 evaluation, his composite results indicated an IQ of 72. Stolzfus had concluded that, taken together, the scores over the past five years continued to place defendant in the deficit range of intellectual capability. The trial court did not make a specific determination regarding the relative level of intellectual disability.

The trial court did, however, equate the evidence about competency to stand trial or about a GEI defense as the determinants of defendant's relative culpability. As noted above, the court commented,

> "I mean, the whole point of diminished capacity or of an intellectual disability in the Court's view in terms of culpability is can the offender understand what they're doing. Can they understand that it is wrong. Can they understand it is a crime. And all of the evidence is that [defendant] could and did."

After reviewing other factors, the trial court returned to the question of intellectual disability and commented that, if the court did not impose the sentence dictated by statute, then the court would send the message that, if you are intellectually disabled, then "you don't have to follow the law."

We respectfully disagree. "The whole point" of intellectual disability is not simply to ask whether defendant knows the nature of the offense or whether he can conform his conduct. It is to determine the degree of culpability of defendant's conduct. Because intellectually disabled offenders have reduced abilities "'to understand and process information, to learn from experience, to engage in logical reasoning, and to control impulses,'" they "'do not act with the level of moral culpability that characterizes the most serious adult criminal conduct.'" *Ryan*, 361 Or at 618 (quoting *Atkins*, 536 US at 306). The lessened culpability of intellectually disabled offenders brings into question the goals of retribution and deterrence that may justify punishments of particular severity. An offense may be relatively less reprehensible, even if equally harmful, when committed by an intellectually disabled offender as opposed to a high-functioning one.

Unlike the tests for incapacity and GEI, the purpose of Article I, section 16, is not to determine whether a person minimally qualifies to stand trial or assume criminal responsibility. Instead, proportionality analysis requires the court to consider the "constitutional implications" of a defendant's diminished culpability, *id.* at 624, specifically, the fit between the offense and the penalty, *Rodriguez/Buck*, 347 Or at 62 (a more severe penalty should be imposed for a more

severe offense, and a less severe penalty should be imposed for a less severe offense). Unlike incapacity or a GEI determination, intellectual disability does not necessarily foreclose altogether the possibility of a prison sentence. Instead, the "broad spectrum of intellectual disabilities may *reduce*, but *not erase*, a person's responsibility for her crimes." *Ryan*, 361 Or at 621 (emphases added).[8]

We acknowledge that our trial courts are often given the difficult task of applying new constitutional standards, in the first instance, without detailed guidance beforehand. If, thereafter, an appellate court finds error, the trial court has nonetheless assisted the appellate court through development of the record, allowing the appellate court to reach a more developed answer in the end.

We conclude that the trial court erred in failing to consider the effect, if any, of defendant's serious intellectual disability in determining his culpability for the offense as culpability relates to the severity of the mandated term of imprisonment. We understand that the trial court accepted the determination of the evaluations. Although the court found little, if any, support for the representation that defendant functioned like a 10-year-old, the trial court, by finding intellectual disability, seems to have accepted the findings that defendant had impaired adaptive functioning and that his IQ scores had ranged from 50 to 72 over five years. We note that the *Ryan* decision recognized that intellectual disability with IQ scores in the range of 70-75 trigger constitutional review in cases threatening capital punishment. *Id.* at 617 (citing *Atkins*, 536 US at 309 n 5). Here, the trial court seems to have accepted evidence of intellectual disability that puts defendant in that range of potentially diminished culpability. It is a threshold that is different from the threshold of criminal liability of a juvenile, ORS 161.290(1), but it is a fundamental threshold of intellectual disability. It

---

[8] As the *Ryan* decision observed:

"[O]n remand the sentencing court, after considering evidence of defendant's intellectual disability, may impose a lesser sentence than the prescribed Measure 11 sentence if the court properly concludes that the prescribed sentence is constitutionally disproportionate to the offense based on evidence in the record."

361 Or at 624 n 13.

is an indication of such serious intellectual disability that, if true, requires the trial court in sentencing to consider intellectual disability, among all other factors, in the determination of proportionality.

## IV.   CONCLUSION

Because the trial court erred under Article I, section 16, in imposing the mandatory sentence of 75 months' imprisonment without considering defendant's intellectual disability beyond evidence of trial competency and a GEI defense, we vacate the sentence and remand for resentencing.

Sentence vacated and remanded for resentencing; otherwise affirmed.